IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT COURT OF CALIFORNIA

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,        No. 2:10-cv-00458-KJM-KJN

  vs.

LAWRENCE "LEE" LOOMIS, et al.,

        Defendants.        <u>ORDER</u>

_____/

        This case was on the court's June 28, 2013 calendar for the motion for summary judgment brought by plaintiff Securities and Exchange Commission (the "SEC") on its claims against defendant Lawrence "Lee" Loomis. Jeremy Pendrey and John Yun appeared for the SEC, and Douglas Beevers appeared for Loomis. For the reasons stated below, the court GRANTS the SEC's motion.

    I.    PROCEDURAL HISTORY AND UNDISPUTED FACTS

        From 2007 to 2008, Loomis controlled Loomis Wealth Solutions ("LWS"), an entity that provided financial planning services to individuals. (Compl. ¶¶ 9, 11, ECF 1; Loomis Ans. ¶¶ 9, 11, ECF 9.) Loomis's father-in-law, John Hagener, controlled Lismar Financial Services, LLC, which Hagener created to manage Naras Secured Fund, LLC and

/////

1

Naras Secured Fund # 2, LLC ("Naras Fund 1" and "Naras Fund 2" or collectively, "Naras Funds").  (Compl. ¶¶ 10-12; Loomis Ans. ¶ 10; Hagener Ans. ¶ 10.)

In February 2007, the Naras Funds began offering equity securities to investors known as "membership interest units."  (Compl. ¶¶ 14-15; *see* Loomis Ans. ¶¶ 14-15.)  The Private Placement Memoranda ("PPM") describe the Naras Funds and identify Lismar as the manager of the Naras Funds.  (Naras Fund 1 PPM at 19, Ex. 1 to Decl. of Jeremy E. Pendrey (Pendrey Decl.), ECF 64-11; Naras Fund 2 PPM at 19, Ex. 2 to Pendrey Decl., ECF 64-13.)  The PPM specify that the membership units were not registered with the SEC for offer or sale.  (Naras Fund 1 PPM at 1, Naras Fund 2 PPM at 2.)  Additionally, the SEC has attested that neither fund was registered.  (Pendrey Decl., Ex. 9, ECF 64-15 at 72; Pendrey Decl., Ex. 10, ECF 64-15 at 74.)

Loomis and LWS recruited investors for the Naras Funds by advertising two-hour seminars and weekend-long seminars through newspaper advertisements and direct mailing of pamphlets.  (Decl. of Melissa Wikstrom (Wikstrom Decl.) ¶ 3, ECF 64-20.)  At one seminar in March 2008, Loomis advised potential investors that Naras Fund 2 was like a savings account and had a twelve percent guaranteed rate of investment.  (Decl. of David Ronald Bailey (Bailey Decl.) ¶ 2, ECF 64-3.)

LWS issued a newsletter called "*True Wealth*" that it sent to LWS members and posted on the LWS website.  (Wikstrom Decl. ¶ 6.)  The October 2007 edition of *True Wealth* included a one-page article about the Naras Funds entitled "*What is Naras?*"  (*Id.*)  Loomis's employee, Melissa Wikstrom (known as Melissa Bowman at the time), wrote the article but the contents were dictated by Loomis and Hagener.  (*Id.* ¶¶ 6-7.)  The "*What is Naras?*" article stated that Naras Funds "are allocated as a second position on mortgages . . . ."  (Ex. A to Wikstrom Decl., ECF 64-20.)  The article also explained that Naras Funds "offer[] a flat, guaranteed 12% per annum, so a $100,000 account would yield $12,000 for the year, or $1,000 per month."  (*Id.*)  It continued that Naras Funds "allow[] the liquidity of withdrawing funds for real estate transactions, but unlike a traditional savings account, you continue to receive interest on that money for up to ten days after withdrawal."  (*Id.*)  The article advised that Naras was

1  not FDIC insured and that interested investors should read the PPM for a full description of
2  risks. (*Id.*) The article states that "NARAS I is currently at its maximum amount for total
3  dollars contributed, however, we are working on opening another account for our members
4  whom [sic] are still interested in this savings option." (*Id.*)
5         Loomis would also schedule one-on-one meetings with potential investors.
6  (Wikstrom Decl. ¶ 4; Testimony of James R. Stryker (Stryker Test) at 86:15-18, Ex. 4 to
7  Pendrey Decl., ECF 64-15.) At these meetings, Loomis encouraged potential investors to
8  invest in the Naras Funds, advised that they were safe investments similar to a savings account,
9  and that they paid a twelve percent interest rate. (Wikstrom Decl. ¶ 5; Stryker Test. at 96:6-8.)
10 In March 2007, Loomis told one investor that Naras Fund 2 was secured with a guaranty and
11 provided a twelve percent annual rate of return. (Decl. of Paul W. Thompson (Thompson
12 Decl.) ¶ 2, ECF 64-17.) He told other investors in Naras Fund 2 that they would be able to
13 retrieve their investments on short notice. (Decl. of George J. Yao (Yao Decl.) ¶ 5, ECF 64-21;
14 Decl. of Frank Zorrilla (Zorrilla Decl.) ¶ 3, ECF 64-22; Decl. of Rodney Julianus (Julianus
15 Decl.) ¶ 3.) Loomis would tell the investors to review the PPM, but some investors never
16 received a copy. (Stryker Test. at 86:17-87:20.)
17         Loomis also told potential investors that the funds were secured by second
18 mortgages on real estate. (*Id.* at 96:13-97:12; Yao Decl. ¶ 3, ECF 64-21.) Stryker testified:

> There was [sic] . . . unrecorded second mortgages. . . . [M]y
> understanding is, they had a vault of all these notes and deeds of
> trust, and it was all ready to be recorded, but didn't record. It was
> just there in good faith because, after all, the members were
> working with [LWS] in a contract, so everyone understood their
> roles.

24 (Stryker Test. at 97:7-13.) Stryker, an investor in the Naras Funds who also opened a LWS
25 branch in Seattle, testified that he further understood that Naras had a twenty percent mortgage
26 in property owned by its members. (*Id.* at 98:5-10.)
27         Loomis and Hagener executed a master loan agreement (the "Promissory Note")
28 to Advantage Financial Group Holdings, LLC ("AFG") in favor of Naras Fund 2. (Pendrey

3

Decl. ¶ 4; Promissory Note, Ex. 3 to Pendrey Decl., ECF 64-15.)  The agreement represented that AFG would pay fourteen percent in annual interest for each loan made to AFG.  It stated that "[f]or each loan on the Master Loan Schedule, [AFG] pledges its Home Equity Line of Credit (HELOC) interest in member investor real estate properties as collateral and any other real estate interest as collateral."  (Promissory Note.)  Loomis signed on behalf of AFG and Hagener signed on behalf of Naras Fund 2.  (*Id.*)

Between March 2007 and August 2008, Naras Fund 1 raised money from over thirty investors.  Although the Naras Fund 1 PPM states throughout that the total offering is limited to $975,000.00, (Naras Fund 1 PPM at 1, 9, 11, 18), a forensic accountant retained by the SEC determined that the total aggregated sales amounted to $1,303,083.97.  (Decl. of Carolyn Van Alst (Van Alst Decl.) ¶¶ 9-10; Ex. A, ECF 64-18 at 4, 9.)   The value of the investments exceeded $1 million by October 2007.  (*Id*. ¶ 10.)  During the same time period, Naras Fund 2 raised over $10 million from eighty-one investors.  (*Id.* ¶¶ 9-10.)

In August 2007, Loomis asked the Certified Public Accounting firm of Francis, Scinto & Graziano, LLP ("FS&G") to provide cash reporting and accounting work for LWS, AFG, Advantage Financial Group, Inc., Advantage Financial Partners of California, LLC and Lismar (collectively, the "Loomis Entities"), as well as Naras Fund 1 and Naras Fund 2.  (Decl. of David P. Scinto (Scinto Decl.) ¶ 2, ECF 64-16.)  Loomis and Hagener did not provide documents that the FS&G accountants requested, including contracts or documentation showing that the HELOCs existed, or proof that the Naras Funds had a security interest.  (*Id.* ¶ 5.)  Loomis asked FS&G to create a statement showing that Naras Funds investors were earning twelve percent in interest on their investments but FS&G refused, on the grounds that such a statement would be misleading.  (*Id*.)   FS&G told Loomis that the companies were undercapitalized.  (*Id.* ¶ 6.)  The companies fell behind on their payments to FS&G and FS&G terminated their services in December 2007.  (*Id.* ¶¶ 7-8.)

The former controller of AFG predecessor Advantage Financial Partners of California, Karen White, stated in her declaration that the company was often short on cash when she worked there from 2006 until February 2008.  (Decl. of Karen L. White (White

4

1  Decl.) ¶¶ 2, 4, ECF 64-19.)  If the Loomis Entities had insufficient funds to make mortgage,
2  insurance or payroll payments, Loomis would instruct White or her coworker to use funds from
3  the Naras Funds accounts.  (*Id.* ¶¶ 4-5.)  SEC's forensic accountant determined that only one
4  interest payment was made by AFG to the Naras Funds under the Promissory Note.  (Van Alst
5  Decl. ¶ 11.)  White explained that the interest payments were made to the Naras Funds with the
6  understanding that the payment would be transferred back to the other entities.  (White Decl.
7  ¶ 7.)

8     In June 2008, LWS had a conference call with its members.  (Wikstrom Decl.
9  ¶ 8.)  Loomis addressed the unsigned HELOCs during this call and said that he was meeting
10 with his attorneys about this issue but there was no specific date for the HELOCs to be signed.
11 (Ex. B to Wikstrom Decl., ECF 20.)  During discovery, the SEC's real estate and accounting
12 expert witness, Paul Habibi, reviewed the list of 120 HELOC properties. (Decl. of Paul Habibi
13 (Habibi Decl.) ¶ 6.)  Habibi located escrow statements and appraisals for 55 of the properties
14 and ordered title profile reports for each of those properties.  (*Id.* ¶ 7.)  None of these properties
15 had a deed of trust recorded in favor of Naras Funds or any of the Loomis entities.  (*Id.* ¶ 8.)
16 Habibi was only able to obtain partial escrow files for the other properties, none of which
17 contained deeds of trust in favor of the Naras Funds or Loomis Entities.  (*Id.*)  Habibi was also
18 unable to locate unrecorded deeds of trust in favor of any of the properties.  (*Id.*)

19    The review by the SEC's forensic accountant showed that the amount owed by
20 Naras Fund 1 to its members exceeded the amount in Naras Fund 1's account by the end of
21 August 2007, continuing through 2008.  (Van Alst Decl. ¶ 13.)  The amount owed by Naras
22 Fund 2 to its investors was greater than the money in the Naras Fund 2 accounts from June
23 through November 2007, as well as in 2008.  (*Id*. ¶ 14.)  In April 2008, funds from new
24 investors in Naras Fund 2 were used to pay old investors.  (*Id*. ¶ 16.)

25    When investors tried to withdraw their invested funds from Naras Fund 2 as
26 they were promised they could do, their money was not returned.  (Yao Decl. ¶¶ 5-6; Zorrilla
27 Decl. ¶ 5; Julianus Decl. ¶ 4.)  One investor in Naras Fund 2 stated that he never received any
28 interest payments.  (Zorrilla Decl. ¶ 5.)

The SEC filed a complaint against Loomis, Hagener, LWS and Lismar on February 23, 2010. (ECF 1.) The complaint alleges claims against all defendants for: (1) violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5; (2) violations of Section 17(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77q(a); (3) violations of sections 17(a)(2) and (3) of the Securities Act, 15 U.S.C. § 77q(a)(2); and (4) violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c). Additionally, the complaint alleges (1) violations of Section 206(1) and 206(2) of the Advisers Act, 15 U.S.C. § 80b-6(1); and (2) violations of Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), by Hagener and Lismar.

The SEC filed a motion for summary judgment on February 13, 2013. (ECF 64.) The court ordered the motion stayed on March 11, 2013, pending resolution of Loomis's criminal case arising from the same events and of the motion for expansion filed by Loomis's federal defender in that criminal case, *United States v. Loomis*, 12-cr-00315-JAM. (ECF 70.) After the motion for expansion was granted, the parties stipulated to a new briefing schedule for the motion for summary judgment, which was then set for hearing on June 28. (ECF 80, 81.) In the meantime, on April 15, 2013, the court entered an order of injunction as to Hagener, as stipulated between the parties, enjoining him from violating the above-listed statutes. (ECF 82). Loomis filed an opposition to the motion for summary judgment on April 30, 2013. (ECF 83.) The SEC filed a reply on May 10, indicating it was no longer seeking summary judgment as to Hagener. (ECF 84.) On June 26, 2013, Loomis filed a motion to stay, which the court denied without prejudice on August 27, 2013. (ECF 88, 96.)

II.     STANDARD

A court will grant summary judgment "if . . . there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "threshold inquiry" is whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

/////

1    The moving party bears the initial burden of showing the district court "that
2 there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v.*
3 *Catrett*, 477 U.S. 317, 325 (1986). The burden then shifts to the nonmoving party, which
4 "must establish that there is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co.*
5 *v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986). In carrying their burdens, both parties must
6 "cit[e] to particular parts of materials in the record . . .; or show [] that the materials cited do
7 not establish the absence or presence of a genuine dispute, or that an adverse party cannot
8 produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); see also *Matsushita*,
9 475 U.S. at 586 ("[the nonmoving party] must do more than simply show that there is some
10 metaphysical doubt as to the material facts"). Moreover, "the requirement is that there be no
11 genuine issue of material fact . . . . Only disputes over facts that might affect the outcome of the
12 suit under the governing law will properly preclude the entry of summary judgment."
13 *Anderson*, 477 U.S. at 247-48 (emphasis in original).
14    In deciding a motion for summary judgment, the court draws all inferences and
15 views all evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at
16 587-88; *Whitman v. Mineta*, 541 F.3d 929, 931 (9th Cir. 2008). "Where the record taken as a
17 whole could not lead a rational trier of fact to find for the non-moving party, there is no
18 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v.*
19 *Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).
20    III.   ANALYSIS
21        A.   Material Misrepresentations and Omissions
22    Rule 10b-5 implements Section 10(b) of the Securities Exchange Act and
23 provides that it is "unlawful" to "employ any device, scheme or artifice to defraud," to "make
24 any untrue statement of a material fact or to omit to state a material fact necessary in order to
25 make the statements made, in light of the circumstances under which they were made, not
26 misleading," or to "engage in any act, practice, or course of business which operates or would
27 /////
28 /////

operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5.  Under Section 17(a)(1) of the Securities Act, it is unlawful in the offer or sale of securities

> (1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a).

The SEC argues that Loomis violated Rule 10b-5 and Section 17(a)(1) by making materially false statements and omissions.  (ECF 64-1 at 11-12.)  Under both statutes, an omitted or misstated fact is material if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, ___ U.S. ___, 131 S. Ct. 1309, 1318 (2011) (quoting *Basic v. Levinson*, 485 U.S. 224, 236 (1988)); *accord SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007).  Scienter is an element of a violation of Rule 10b-5 and of Section 17(a)(1).  *Aaron v. SEC*, 446 U.S. 680, 697 (1980) (Section 17(a)); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976) (Rule 10b-5).  Recklessness satisfies the scienter element.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990).

"[R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* at 1569 (citing *Sunstrand Corp. v. Sun Chem. Corp.*, 553 F. 2d 1033, 1044-45 (7th Cir. 1977)).  Recklessness is evaluated through "'a subjective inquiry' turning on 'the defendant's actual state of mind.'" *In re S.E.C. Platforms Wireless Intern. Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010) (citing *Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010)).  However, "[w]hen the defendant is aware of the facts that made the statement misleading, 'he cannot ignore the facts and plead ignorance of the risk.'" *Id.* at 1094 (citing *Makor Issues & Rights, Ltd. v. Tellabs*

*Inc.*, 513 F.3d 702, 704 (7th Cir. 2008)); *see also In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010) ("A statement can constitute a material misrepresentation giving rise to Section 10(b) or Rule 10b–5 liability if there is no reasonable basis for the speaker's belief in the statement's accuracy or if the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy.").

The SEC contends that the representations that Loomis made in the "*What is Naras?*" article and in personal meetings with investors—that the Naras loan funds were secured by second mortgages, that the investments were highly liquid, and had a twelve percent rate of return—were material and knowingly or recklessly false. (ECF 64-1 at 12-15.)

        1.      Representations About Second Mortgages

The SEC asserts, and Loomis does not dispute, that Loomis's statements that the loans were secured by second mortgages were material. The court agrees the statements were material because a reasonable investor would have considered this factor as significant in considering whether to invest in Naras. *See In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 930 (9th Cir. 1993) ("Where a defendant affirmatively characterizes . . . loans as 'substantially secured,' 'a defendant declares the subject of its representation to be material to the reasonable shareholder . . . .'" (citing *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d. Cir. 1992)), *cert. denied*, 113 S. Ct. 365 (1992)); *Hall v. Sec. Planning Servs., Inc.*, 419 F. Supp. 405, 407 (D. Ariz. 1976) (defendants falsely told purchasers of notes that the notes were secured by real property mortgages, though no mortgages had been recorded, in violation of Rule 10b-5).

Additionally, the SEC contends that Loomis knew of or was at least reckless with respect to the fact that there were no mortgages recorded in favor of Naras. (ECF 64-1 at 14.) Loomis argues that the SEC has not demonstrated the requisite scienter because Loomis did not make misrepresentations he "knew" were false about the lack of second security interests. (ECF 83 at 6.) The SEC has provided evidence that Loomis did not respond to Scinto's request for information to show that HELOCs existed and were recorded. Additionally, Loomis referenced unsigned HELOCs during a June 2008 conference call. (ECF 64-1 at 14.) In response, Loomis asserts there are alternative explanations for the fact that the

mortgages were not recorded. Specifically, he suggests he might have planned to obtain second mortgages in the future or used money from the Naras account as down payments on member homes to create a trust in favor of Naras. (*Id.* at 7.)

But as the SEC argues, Loomis has provided no evidence that supports the alternate explanations he proposes for his failure to obtain second mortgages, from the time that he and Hagener began offering membership interest units to investors in February 2007 to the time of the conference call in June when he made the remark regarding the lack of HELOCs. Loomis's actions here are analogous to the defendants' in *Platforms Wireless*. In that case, the defendant's corporation issued press releases stating that the corporation had developed prototypes for a new cellular communications technology, when the corporation in fact only had a design of the prototype and had not obtained funding to actually build it. 617 F.3d at 1081-82. The court rejected the defendant's contention that his personal belief that the press release was not misleading could create a triable issue of fact as to scienter. *Id.* at 1095. The defendant also asserted that the corporation intended to soon acquire the necessary components and that it was customary to develop prototypes over time. The defendant's unspoken intentions, however, did not negate the fact that the defendant knew the press statements were untrue when they were issued. *Id.* Similarly here, even if Loomis did plan to record the mortgages in the future, he does not dispute that he told investors that the loans were secured when they were not. The undisputed evidence establishes that Loomis either knew that his statements were false at the time he made them, or that he at least did not take care to ensure that the loans were secured before seeking investors. This record meets the standard for recklessness under *Hollinger*.

In response, Loomis contends the court cannot infer that he knowingly or recklessly made false representations about the mortgages based on his exercise of the Fifth Amendment right to silence. (ECF 83 at 8.) "When a party asserts the privilege against self-incrimination in a civil case, the district court has discretion to draw an adverse inference from such assertion." *Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911 (9th Cir. 2008). "A decision not to draw the inference poses substantial problems for an adverse party who is

10

deprived of a source of information that might conceivably be determinative in a search for the truth." *Id.* (citations, quotations removed). In *SEC v. Colello*, the SEC sued an individual for receiving proceeds from securities fraud, a cause of action that normally requires the SEC to show that the individual both received the victims' funds and had no legitimate claim to them. 139 F.3d 674, 677 (9th Cir. 1998). On appeal, the Ninth Circuit held that the district court permissively placed the burden on defendant to show he had no legitimate claim to the proceeds, because defendant had invoked the Fifth Amendment right to silence. *Id.* The Ninth Circuit went on to explain that defendant's silence alone was not enough to support summary judgment in SEC's favor, but that the silence combined with SEC's evidence that defendant received the victims' funds, and defendant's lack of any evidence to show he had a legitimate right to the proceeds, was enough to support the district court's ruling. *Id.* at 678.

Here, however, the SEC has presented evidence showing that each element of a Rule 10b-5 and Section 17(a)(1) violation is met based on Loomis's statements that there were mortgages securing the Naras loans. At that point, the burden shifted to Loomis to show that there is a genuine dispute of material fact regarding one or both of these issues. But Loomis has not presented any evidence in opposition to the SEC's motion and, unlike in *Colello*, the SEC has produced evidence relevant to each factor of a Rule 10b-5 and Section 17(a)(1) violation. Thus, even if the court were to draw an adverse inference from Loomis's silence to support its conclusion that Loomis violated Rule 10b-5, the permissibility of doing so is even stronger than in *Colello*, where the SEC had provided concrete evidence supporting only one factor of the securities violation.

Finally, Loomis seems to argue that any representations in the "*What is Naras?*" article are not material because only people who had already invested in Naras received the article; in other words, none of those investors could have relied on any misrepresentations in the article when making the decision to invest in Naras. (ECF 83 at 10.) But reliance is not an element for a claim under Rule 10b-5 brought by the SEC; it is only a required element when the claim is brought by a private party. *S.E.C. v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993); *see also Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, ___ U.S. ___,

11

133 S. Ct. 1184, 1192 (2013) (reliance "is an essential element of the § 10(b) private cause of action because proof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury") (citations and quotations omitted).

### 2. Statements Regarding Guaranteed Rate of Return

The SEC contends Loomis's representations that the investment would yield a twelve percent rate of return and that investors could easily retrieve their capital were both material and false. (ECF 64-1 at 14-15.) On the record before the court, the court agrees. Representations about forecasts are material to a reasonable investor, *Provenz v. Miller*, 102 F.3d 1478, 1488-89 (9th Cir. 1996), and may constitute material representations when they are sufficiently specific. For example, in *In re Amgen Inc. Sec. Litigation*, 544 F. Supp. 2d 1009, 1027 (C.D. Cal. 2008), statements that defendants were optimistic about future growth in the market for a particular product were material. Here, Loomis told investors they would receive twelve percent interest annually, which is more specific than the statements in *Amgen*. The SEC's admissible evidence demonstrates that Loomis made these statements knowingly or recklessly because he continued to advertise these terms to potential investors when the Naras Funds were short on cash.

Loomis asserts the SEC has not shown that he acted with scienter, arguing that the disclosures in the PPM that the investments were risky mitigate the statements he made regarding the anticipated rate of return. (ECF 83 at 9-11.) Warnings of risk may shield sellers of securities from liability when they make "forward-looking statements" predicting the success of an investment. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947-48 (9th Cir. 2005). Courts, however, have held that "boilerplate language warning that investments are risky or general language not pointing to specific risks is insufficient to constitute a meaningful cautionary warning. The cautionary warning ought to be precise and relate directly to the forward-looking statements at issue." *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 919 (N.D. Cal. 2012), *on reconsideration in part* (N.D. Cal. Jan. 10, 2013) (citing *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 882 (N.D. Cal. 2004)). Here, Loomis made statements to investors about the rate of return and their ability to retrieve their

12

investments after he already knew the statements were inaccurate. No later than December 2007, when FS&G terminated its relationship with the Naras Funds and the Loomis entities, Loomis had been told the Naras Funds were undercapitalized and could not guarantee a twelve percent rate of return. Yet, the Naras Funds were still acquiring investors through August 2008. Accordingly, the statements Loomis made were not forward-looking predictions; they were misrepresentations.

### B. Scheme Liability

The SEC asserts that Loomis also is liable under subparts (a) and (c) of Rule 10b-5 and subparts (1) and (3) of Section 17(a) for engaging in a scheme to defraud. (ECF 64-1 at 15.) The SEC contends that Loomis used funds from new investors in the Naras Funds to pay earlier investors. (ECF 64-1 at 8-9, 20.) "Courts have generally held that [a] Rule 10b-5(a) and/or (c) claim cannot be premised on the alleged misrepresentations or omissions that form the basis of a Rule 10b–5(b) claim." *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039, 1057 (9th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 2713 (2012) (citations and quotations omitted). It is important that "the lines dividing the different claims are [] 'carefully maintained' and are 'well-established.'" *Id.* (citing *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009)). Yet, the same set of facts may give rise both to a violation of subsection (b) and subsections (a) and/or (c) if plaintiff alleges "that the defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations." *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005); *see also U.S. S.E.C. v. Brown*, 878 F. Supp. 2d 109, 122 (D.D.C. 2012) (applying this standard to motion for summary judgment). Here, the SEC has provided evidence that Loomis misrepresented the solvency of the Naras Funds while simultaneously accepting new investors to make payments to older investors. Because this deceptive conduct went beyond mere misrepresentations, the SEC has established that Loomis is liable for these additional violations.

### C. Violations of Securities Act Sections 5(a) and 5(c)

Sections 5(a) and 5(c) of the Securities Act prohibit the offer or sale of securities in interstate commerce without prior registration with the SEC, unless the transaction qualifies

for an exemption from registration. 15 U.S.C. § 77e(a), (c); *Platforms Wireless Int'l Corp.*, 617 F.3d at 1085. In reviewing whether Section 5 was violated, the Ninth Circuit has noted that the focus is properly placed on economic reality rather than form; the inquiry is whether "in substance" the securities were issued without registration or an exemption. *Platforms Wireless*, 617 F.3d at 1086 (quoting *S.E.C v. M & A West, Inc.*, 538 F.3d 1043, 1053 (9th Cir. 2008)).

The SEC can establish a *prima facie* Section 5 violation by showing (1) "that no registration statement was in effect," (2) "that [Loomis] sold or offered for sale the securities," and (3) "that there was use of interstate transportation, communication, or the mails in connection with the sale or offer for sale." *S.E.C. v. Lowrance*, No. 11-CV-03451-EJD, 2012 WL 2599127, at *4 (N.D. Cal. July 5, 2012) (citing *S.E.C v. Cavanagh*, 1 F. Supp. 2d 337, 361 (S.D.N.Y. 1998), *aff'd*, 155 F.3d 129 (2d Cir. 1998)). Proof of scienter is not required. *S.E.C. v. Rose Fund, LLC*, No. C 03-04593 WHA, 2004 WL 6069175, at *9 (N.D. Cal. Sept. 17, 2004) ("Neither negligence nor scienter is an element of a prima facie case under Section 5 of the Securities Act." (quoting *S.E.C. v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1367 (S.D. Fla. 1999))), *aff'd*, 156 F. App'x 3 (9th Cir. 2005). "Once the SEC introduces evidence that a defendant has violated the registration provisions, the defendant then has the burden of proof in showing entitlement to an exemption." *S.E.C. v. Murphy*, 626 F.2d 633, 641 (9th Cir. 1980). The exemptions to registration are construed narrowly to provide full and fair disclosure of the securities' character and to prevent fraudulent sales. *Id.* As the movant on summary judgment, the SEC bears the burden of proving that no genuine issue of material fact exists, even where Loomis would have the burden of proof at trial. *Murphy*, 626 F.2d at 641.

However, Loomis must still "make a showing sufficient to establish the existence of an element essential to [his] case," that an exemption applied. *Celotex Corp.*, 477 U.S. at 322. Therefore, once the SEC has produced evidence demonstrating a *prima facie* violation of the registration provision, Loomis must make a sufficient showing to raise a genuine issue of material fact. The SEC is then entitled to summary judgment only if it demonstrates (1) that no genuine issue of material fact exists; or (2) that, viewing the evidence

in the light most favorable to Loomis, the SEC is clearly entitled to prevail as a matter of law. *Murphy*, 626 F.2d at 641; *see also S.E.C. v. Poirier*, 140 F. Supp. 2d 1033, 1044 (D. Ariz. 2001).

### 1. Establishment of a *Prima Facie* Case

The SEC has established a *prima facie* case that the securities offerings in Naras Fund 1 and Naras Fund 2 were unregistered. Loomis admits that the Naras Funds "membership units" constituted equity securities. The PPM distributed to potential investors for both funds state on their first pages that the securities offered are not registered with the SEC. (ECF 64-11 at 5; ECF 64-13 at 2.) The SEC has attested, admissibly, that neither fund was registered. (Attestations of Aimee Primeaux, SEC Branch Chief, ECF 64-15 at 72, 74.)

In addition to confirming that the membership units were securities and not registered with the SEC, the PPM also state explicitly that they constitute an offer:

> THESE ***SECURITIES*** HAVE ***NOT BEEN REGISTERED*** WITH THE UNITED STATES SECURITIES COMMISSION ("SEC" OR "COMMISSION") OR ANY STATE SECURITIES COMMISSION, BUT ARE ***OFFERED*** PURSUANT TO A CLAIMED EXEMPTION FROM REGISTRATION PROVIDED BY THE SECURITIES ACT OF 1933…

(ECF 64-11 at 5, ECF 64-13 at 2, emphasis added.) Loomis admits that the sale of the membership units in the two funds constituted an offer of securities. Declarations support the fact that Loomis personally sold at least some of the securities to prospective investors. (Yao Decl.; Zorrilla Decl.) Lastly, Loomis admits to the use of interstate transportation, communication, or the mails in connection with the offer. The SEC has therefore established a *prima facie* case of an unregistered securities offering in violation of Section 5.

### 2. Loomis's Proffered Exceptions

Loomis argues that both of the funds in question were exempt from registration. He says that Naras Fund 1 was exempt under 17 C.F.R. § 230.504 ("Rule 504"). (ECF 83 at 6.) Rule 504 exempts from the registration requirements a sale of securities that does not exceed $1,000,000. 17 C.F.R. § 230.504. He also says that Naras Fund 2 was exempt under 17 C.F.R. § 230.506 ("Rule 506"). (ECF 83 at 6.) Rule 506 exempts a sale made to 35 or fewer

1    purchasers under certain conditions.  17 C.F.R. § 230.506.  As stated above, because the SEC
2    has established a *prima facie* case, Loomis bears the burden of raising a genuine issue of
3    material fact supported by probative evidence, not merely a "metaphysical doubt."  If he does
4    so, the SEC, as the movant for summary judgment, bears the burden of proving there is no
5    genuine issue of material fact and that Loomis is not entitled to an exemption as a matter of
6    law.

                    i.        Rule 504 Exception for Naras Fund 1

8           To qualify for a Rule 504 exemption, the Naras Fund 1 securities offering must
9    meet certain conditions, including that the aggregate offering price for the securities must not
10   exceed $1,000,000.  The SEC alleges that the exemption is inapplicable because the aggregate
11   offering price here exceeded one million dollars.  (ECF 64 at 19.)  Although the Naras Fund 1
12   PPM states throughout that the total offering is limited to $975,000.00, the SEC provides
13   evidence that the total aggregated sales amounted to $1,303,083.97.  (ECF 64-18 at ¶ 9.)
14   Loomis argues the SEC has failed to prove his liability because the evidence supports his
15   involvement in Naras Fund 1 sales only as late as March 2007, which is well before the breach
16   of the threshold in October 2007.  (ECF 83 at 6; ECF 64-18 ¶ 10.)  The SEC responds that
17   regardless of whether Loomis personally sold the unregistered securities that exceeded the
18   threshold, the evidence supports the conclusion that he was a necessary participant in those
19   sales, making him equally liable.  (ECF 84 at 10.)

20          Based on the record available to the court, the court finds Loomis has not
21   sufficiently raised a genuine issue of material fact beyond what would constitute a
22   "metaphysical doubt."  *Matsushita*, 475 U.S. at 586.  He has provided no probative evidence to
23   support his contention that he was not responsible for the sale of the Naras Fund 1 securities, an
24   essential element to a finding that the Rule 504 exception excludes him from liability.  None of
25   the evidence of record suggests that any other individual was engaged in sales of the Naras
26   Fund 1 securities.  Even when the evidence is viewed in the light most favorable to Loomis, the
27   court finds he has not raised a question of whether his conduct fell into the Rule 504 exemption
28   because of his significant participation in the Naras Fund 1 sales.  Thus the burden does not

shift back to the SEC to provide the non-existence of Loomis's facts. The court need not reach the question of whether Loomis was a "necessary participant" in the specific sales exceeding the threshold.

### ii. Rule 506 Exception for Naras Fund 2

In order for the sale of Naras Fund 2 securities to qualify for an exemption under Rule 506, Loomis would be required to show at trial, *inter alia*, that the offering was in compliance with 17 C.F.R. § 230.502 ("Rule 502"). One of the requirements of Rule 502 is that before the sale of a security to a non-"accredited investor," the issuer must provide the investor with certain financial information. The SEC alleges this requirement was not met during the sales of Naras Fund 2 securities, citing the Bailey declaration as evidence of one example of a violation. (ECF 64 at 20.) Loomis does not dispute that the financial information was not provided, but alleges that the SEC's argument is insufficient because there is no evidence that Loomis was informed of Bailey's net worth at the time Loomis sold him the Naras Fund 2 securities. (ECF 83 at 6). The SEC argues that ignorance of Bailey's status as a non-accredited investor is immaterial to whether Loomis provided him with required information. (ECF 84 at 14-15.)

Again, Loomis has not sufficiently raised a genuine issue of material fact demonstrating he could plausibly qualify for a registration exemption. Loomis has provided no probative evidence to support the contention that he reasonably believed that Bailey and other investors were accredited, an essential element for establishing the applicability of Rule 506. Although the Naras Fund 2 PPM states that the offering is only available to purchasers who qualify as accredited investors, (ECF 64-13 at 12), Loomis has provided no evidence of a completed PPM showing that purchasers actually attested that they were accredited investors before a transaction occurred. Although there are some blank PPM in the record, this is insufficient evidence to establish the existence of a genuine issue of material fact. *See Mark v. FSC Sec. Corp.*, 870 F.2d 331, 337 (6th Cir. 1989) (noting that a "blank subscription document and offeree questionnaire simply do not amount to probative evidence, when it is the answers and information received *from* purchasers that determines whether the conditions of Rule 506

have been met.") Therefore, Loomis has not met his burden to show how Naras Fund 2 could qualify for an exemption, and the court need not address the SEC's additional argument regarding public solicitations. The SEC is entitled to summary judgment on this claim.

IV. CONCLUSION

1. The SEC's motion for summary judgment as to its claims of false material statements and omissions under Rule 10b-5 and Section 17(a) is GRANTED.
2. The SEC's motion for summary judgment as to its claims for scheme liability under subparts (a) and (c) of Rule 10b-5 and subparts (1) and (3) of Section 17(a) is GRANTED.
3. The SEC's motion for summary judgment as to its claims under Section 5(a) and 5(c) of the Securities Act is GRANTED.
4. This case is set for status on October 17, 2013, to discuss the remedial phase of the case. The parties shall file a joint status report no later than October 10, 2013, discussing their joint recommendations, or to the extent they cannot agree, their separate positions.

IT IS SO ORDERED.

DATED: September 3, 2013.

_____
UNITED STATES DISTRICT JUDGE